(107 So. 307)

No. 25864.

McCALLEY v. PUGH et al.

(Feb. 1, 1926.)

*(Syllabus by Editorial Staff.)*

1. **Mines and minerals** ⬤➡101—Purchaser of option on oil lease under no obligation to divide his profit with representative of buyer aiding oil broker, whom he had engaged to make sale under definite commission.

One who, at solicitation of broker, purchased option on oil lease, agreeing to give broker commission for negotiating sale thereof, is under no obligation to divide profit with representative of buyer who assisted in negotiations at request of broker, notwithstanding that partnership or joint adventure may have existed between broker and buyer's representative.

2. **Mines and minerals** ⬤➡97, 101—Evidence held not·to show partnership agreement or joint adventure between speculators in oil leases.

Evidence *held* not to show partnership or joint adventure between speculators in oil leases who had mutually agreed that they would solicit each other's aid and would share equally in any profit that might thereafter result in such co-operation.

Appeal from First Judicial District Court, Parish of Caddo; J. H. Stephens, Judge.

Suit by James B. McCalley against J. C. Pugh and another. From a judgment for defendants, plaintiff appeals. Affirmed.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellant.

Blanchard, Goldstein & Walker, Yandell Boatner, and Hampden Story, all of Shreveport, for appellee Pugh.

Barnette & Roberts, of Shreveport, for appellee Rondeau.

O'NIELL, C. J. The plaintiff has appealed from a judgment rejecting his demand for one-third of a profit of $344,000, alleged to have been made and collected by the defendants, J. C. Pugh and H. E. Rondeau, on the sale of an oil and gas lease, known as the George O. Baird lease, in Claiborne parish.

Appellant contends that he was in partnership, or in a joint adventure, with Pugh and Rondeau, for the buying and selling, or negotiating the sale of, the Baird lease and other such properties, and that Pugh and Rondeau fraudulently misrepresented to him that their profit on the sale of the lease was only $69,000, being 5 per cent. of $2,500,000, or $125,000, less $56,000 for the cost of two tanks on the property. He avers that he was paid on account of his share of the profit $14,250.

Defendants contend that plaintiff's interest in the transaction was only a fourth of a commission of 5 per cent. of $2,500,000, or $125,000, less a fourth of the cost of the two oil tanks on the property, and that he was. paid in full his share of the commission.

The case presents only questions of fact. Rondeau came from Texas to Shreveport soon after the development of the Claiborne oilfield, to speculate in royalties and leases. He had been in the business, and had a wide acquaintance with operators and brokers elsewhere. His idea was to obtain options on extensive oil areas, including a producing lease, and, by turning them over to a large corporation to be organized by him, to make a profit in capital stock in the corporation and to become the manager of the concern. He obtained an option to buy the Baird lease at

the price of $2,100,000 net to Baird, and negotiated with Pugh to buy royalties which he owned and leases in which he was interested. Rondeau submitted the properties, including the Baird lease, to several brokers and prospective buyers whom he knew, including a firm styled Liggett & Drexell, in New York. He failed to make a sale within the time allowed in his option for the Baird lease, and Baird served notice on him that the option had expired. Knowing that Pugh and Baird were close friends, Rondeau suggested to Pugh that, if he would obtain an option on the Baird lease, he (Rondeau) could probably sell it for $2,500,000. Pugh obtained the option to buy the Baird lease for $2,100,000 plus the cost of two oil tanks that were being constructed on the lease; the cost of which tanks would amount to approximately $60,000. Pugh then proposed to Rondeau that, if he would sell the lease for $2,500,000, he (Pugh) would allow Rondeau a commission of one-half of 5 per cent. or half of $125,000, less half of the cost of the two tanks that were being constructed. At the same time, Pugh told Rondeau that he (Pugh) would make an additional profit on the transaction, and Rondeau replied that he was not interested in what Pugh might make.

Before Rondeau came to Shreveport, he had become acquainted with McCalley, the plaintiff in this suit, at Ranger, Tex., and had learned that McCalley was representing capitalists who were in the market to buy oil properties. Before Rondeau's option on the Baird lease had expired, he wired McCalley, proposing to interest him in the transaction, but failed to get into communication with him. Under his new arrangement to sell the Baird lease for Pugh, Rondeau wired McCalley again, having located him in Pittsburg. When McCalley received the telegram, he was confined in a hospital in Pittsburg, having been injured in an automobile accident. McCalley turned the telegram over to J. R.

Flannery, for whom McCalley had been trying to buy oil properties. Flannery wired Rondeau for further particulars, and Rondeau answered with a long telegram, describing and offering for sale the Baird lease and other leases and royalties, and proposing to organize a $10,000,000 corporation, in which he was to have $500,000 of the capital stock. Flannery then sent his secretary to Shreveport to investigate, and employed expert mining engineers to examine and report on the properties. Flannery was satisfied with the reports, and Pugh and Rondeau and Baird and Flannery's secretary went to Pittsburg to close the deal with Flannery. When the party arrived in Pittsburg, Flannery informed McCalley of the negotiations, and the latter came upon the scene and told Pugh that he expected to share in the commission or profit that might be made on the transaction. Pugh declined to have any dealings with McCalley. Rondeau told McCalley that the proposition to Flannery was to sell at a net price, and that McCalley would have to look to Flannery for a commission. Flannery then declined to buy the royalties owned by Pugh, and the latter said that he would go to New York and negotiate with other prospective buyers. Flannery was disposed to help McCalley to share in whatever profit or commission Rondeau and Pugh were to make on the deal. Rondeau then agreed to divide with Pugh and McCalley the $500,000 of capital stock that Rondeau was to have in the corporation that was to be organized to take over the properties, and an agreement was then had that was satisfactory to McCalley, with regard to the commission or profit to be made on the Baird lease. The judgment in this suit depends upon what that agreement was. Rondeau and Pugh testified that the agreement was only between Rondeau and McCalley, and that it was that Rondeau should allow McCalley half of Rondeau's half of the commission of $125,000, less the same

proportion of the cost of the tanks that were being constructed on the Baird lease. McCalley testified that Rondeau and Pugh both agreed that they would divide equally with him (McCalley) whatever their profit might be on the sale of the Baird lease. Flannery testified that he did not remember what the agreement was. There were no other witnesses to the agreement, except Pugh, Rondeau, McCalley and Flannery. The preponderance of the evidence therefore is in favor of the defendants.

The lease was transferred to Flannery, who paid $500,000 in cash. He did not meet the deferred payments; the corporation that was organized to take over the property, therefore, did not acquire title; and the shares of stock that were to be divided among Pugh, Rondeau and McCalley were never delivered. Pugh told Baird to advance McCalley as much as a fourth of the $125,000 commission, less a proportionate share of the cost of the oil tanks, and Baird advanced to McCalley approximately $15,000. Thereafter McCalley learned that Pugh had made a large profit on the option; hence this suit.

[1, 2] We agree with the district judge that the plaintiff has not proven his claim. There was no obligation on the part of Pugh to divide his profit with McCalley, even if the latter was in partnership or in a joint adventure with Rondeau before Pugh acquired the option on the Baird lease; and the evidence does not convince us that there was a partnership agreement or joint adventure between Rondeau and McCalley. They had met in Ranger, Tex., and discussed their oil speculations; but we do not believe, from the evidence, that their mutual understanding went further than an agreement that each would solicit the other's aid in any prospect that might thereafter arise, and that they would share equally any profit that might thereafter result from such co-operation. To that extent, Rondeau has fulfilled his agreement by sharing with McCalley the commission that Rondeau made on the sale of the Baird lease. No fraud or misrepresentation was practiced upon McCalley by either Pugh or Rondeau. The latter had no interest in Pugh's profit on the transaction, and was not under any obligation to tell McCalley what Pugh's profit was. Pugh made no agreement whatever with McCalley with regard to Pugh's profit on the deal.

Plaintiff also claimed in this suit a third of whatever profit Pugh and Rondeau might have made on the other properties that they sold to Flannery, because, as plaintiff alleged, the transaction was made possible only by the aid of plaintiff's acquaintance and connection with Flannery. Plaintiff therefore prayed for an accounting of the additional profit, which he alleged, on his information and belief, exceeded $50,000. That part of the petition seems to have been abandoned. If not abandoned, it is disposed of by our conclusion that there was no partnership relation, or joint adventure, between McCalley and Rondeau, and no obligation on Pugh's part to account to McCalley for any profit that Pugh made.

The judgment is affirmed.